(107 App. Div. 321.)

### BURNS v. PALMER.

(Supreme Court, Appellate Division, Second Department. August 31, 1905.)

**1. MASTER AND SERVANT—DEATH OF SERVANT—NEGLIGENCE—QUESTION FOR JURY.**

Evidence, in an action for the death of an employé engaged in trimming off coal in a bin occasioned by the dumping of coal into the bin, examined, and *held*, that the question of the master's negligence was for the jury.

**2. SAME—METHOD OF DOING WORK—DUTY OF MASTER.**

Where coal trimmers working in coal bins would be killed on coal from a car being dumped into the bins, it is not unreasonable to require the master, in the exercise of reasonable care, to establish and enforce a method whereby an employé in charge of a car must assure himself as to the presence of a fellow workman in a bin, where he would be killed if the coal was dumped.

Appeal from Trial Term, Kings County.

Action by Elizabeth Burns, as administratrix of Thomas White, deceased, against Lowell M. Palmer. From a judgment for defendant, and from an order denying a motion for a new trial, plaintiff appeals. Reversed.

Argued before HIRSCHBERG, P. J., and BARTLETT, JENKS, RICH, and MILLER, JJ.

Henry Yonge (William A. Moller, on the brief), for appellant.
Frederick B. Campbell, for respondent.

WILLARD BARTLETT, J.   The plaintiff's intestate was in the service of the defendant at his coalyard in the borough of Brooklyn, where he was employed to trim coal and do any work which he might be directed to perform about the premises.   In the yard were two long pockets, used for the temporary storage of coal and divided into bins.   These bins were filled with coal, dumped into them from cars which received their loads from boats at a dock on Gowanus street, and were then run along the track and stopped at the bin in which it was desired to place the coal, where by means of a mechanical device the cars were automatically dumped.   The coal was discharged from each bin by means of a chute at the bottom and center of the bin.   With a structure of this kind, as the coal is withdrawn it ceases to flow freely from the chute, and resort is then had to the process known as "trimming," which consists in shoveling the coal closer to the place of discharge.   In the case of soft coal, this trimming is necessary even before the bin has been half emptied.   Between 9:30 and 10 a. m. on December 24, 1902, the person in charge of the defendant's yard sent the plaintiff's intestate, Thomas White, to bin or chute No. 2, in which there was then soft coal, telling him to go up into the pocket and trim off the coal there.   White went into the bin, and was heard at work there by a fellow workman similarly employed in an adjoining bin shortly afterward.   He was never again seen alive.   Later in the day his absence was noted, and a search was instituted, which resulted, two days subsequently, in the discovery of his dead body in bin No. 2

entirely covered with coal, so that it could be reached only by digging and by forcing the corpse down through the chute into the yard. The man had been drowned in coal, just as one of Havemeyer's men was drowned in sugar in the case of Bohn v. Havemeyer, 114 N. Y. 296, 21 N. E. 402.

The record indicates that the principal, if not the only, issue of negligence litigated upon the trial was the question whether the defendant had established and enforced proper rules and regulations in the conduct of its business to prevent the unloading of coal into bins where men might be at work, without seasonable and adequate notice to such workmen in order that they might avoid injury. The rule of law applicable to the circumstances of the case can hardly be better stated than it is by Mr. Justice Parsons, of the Supreme Court of New Hampshire, in McLaine v. Head & Dowst Co., 71 N. H. 294, 52 Atl. 545, 58 L. R. A. 462, where he says:

"The individual who employs two laborers to dig a ditch is not required to stand over them to give warning, or to prevent one from throwing earth upon another. Neither is he required to employ a watchman to give warning to the one, when the other is about to throw a shovelful of earth into or out of the trench. There is no occasion for such a precaution, not because the rule of law is different, but because ordinary care does not demand it in such a case. As the number of servants is enlarged and the work extended, the probability of injury of one by the other is increased. When the nature of the work reasonably demands rules or precautions, the master's duty arises. The master's duty is performed by the adoption of a reasonably suitable method. If ordinary care requires that a warning of dangers arising from the work should descend from time to time be given to his servants as the work progresses, it is the master's duty to provide for such warning. Having made provision for the warning by intrusting the duty to a competent person, he is not liable for the negligence of the person intrusted with the duty."

The evidence in behalf of the defendant showed that some precautions had been taken in the direction indicated. While there were no printed or published rules in the yard, the defendant's foreman testified that there was a rule that the man who went into the bin to trim coal should report to the man attending to the cars; but he qualified this statement by adding on cross-examination:

"I told it to every stranger that goes there to tell the man on the job to give him time to get in the bin and out of it—get out of the bin; and he that dumps the coal knows that he has got to tell every one that goes to trim coal there, or work 'there, to get out of there before he dumps any coal."

The engineer of the defendant, who swore that it was his duty to promulgate rules for the conduct of the business, testified:

"I told the man that has got charge of the car that runs down the coal, he is to go down and notify the men that is in the coal bin; if he is in the bin, the coal is going in the same bin; that the man has got to get out of that pocket, and, if he is in any other pocket there, he notifies them to be careful on account of the car running down."

It is argued in behalf of the defendant that this was sufficient, and that, if the accident occurred by reason of the neglect of the man who was operating the car, a workman named Callan, to notify White that he was about to unload coal into the bin where he was at work, the negligence was that of a fellow servant, for which the defendant cannot be held liable. It may be noted that Callan,

who was called as a witness, did not himself testify to the existence of any such rule or the giving of any such instruction; but, assuming that he was instructed precisely as the defendant's engineer states, it can hardly be held as matter of law that the safeguard adopted was adequate to the situation.   The extent of the instruction to the operator of the car seems to have been that, if he saw or had reason to believe a man was at work in a bin into which he proposed to dump a load of coal, he should notify him to be careful or to get out of the pocket; but I find no indication of any provision for ascertaining with reasonable certainty whether or not anybody was actually at work in the pocket or in the bin, where his presence was not obvious to the manager of the car.   The defendant's engineer testified that the men could not work in a bin with safety while coal was being dumped into it.   "It would kill a man," he said.   In view of this extreme peril to which the coal trimmers were exposed under such circumstances, the jury might not unreasonably deem it obligatory upon a master, in the exercise of reasonable care, to establish and enforce some method of procedure whereby the employé in charge of the car should assure himself beyond a reasonable doubt as to the presence of a fellow workman in a place where he would certainly be killed, if a car load of coal was dumped upon him.

I think that there was evidence enough to take the case to the jury on this question, and that it was therefore error to direct a verdict for the defendant.

Judgment reversed, and new trial granted; costs to abide the event. All concur.